**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| SECURITY FIRST CORP.,[1] | ) |
| | ) Case No. 20-20-12053 (BLS) |
| Debtor. | ) |

**DECLARATION OF PANKAJ PAREKH**
**IN SUPPORT OF DEBTOR'S BANKRUPTCY FILING**

I, Pankaj Parekh, being duly sworn, declares under penalty of perjury as follows:

1. I am the President and Chief Executive Officer of Security First Corp. ("SFC" or "Company" or the "Debtor") in this Chapter 11 case (the "Bankruptcy Case").

2. I am over the age of 18 and am authorized to submit this Declaration. If called as a witness, I could and would completely testify to the facts set forth in this Declaration, which-- for a number of matters, including matters prior to my employment as an officer of the Company as set forth primarily in paragraphs 8, 15, 16 and 17 below-- is based on information and belief formed through the review of documents and conversations with others, not my personal knowledge,

3. In connection with my employment with SFC, I have some familiarity with the Debtor's history prior to my joining the Debtor in August 2018, and I am familiar with its most recent history and the status of its assets and financial affairs. That said, with respect to matters that occurred prior to my employment with SFC, portions of this Declaration are based only on documents I have reviewed, documents reviewed by SFC's counsel and discussions I have had with other persons with knowledge of prior events.

---

[1] The Debtor's last four digits of its U.S. federal tax identification number are 9286. The official mailing address for the Debtor is 27762 Antonio Parkway, Suite L1 #442, Ladera Ranch, CA 92694, although the Debtor no longer maintains a physical office.

**INTRODUCTION**

4. On August 31, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States (the "Bankruptcy Code").

5. The purpose of the Bankruptcy Case is to obtain Court approval for the RSA (defined below) and a reorganization of the Debtor (the "Reorganization") through confirmation of the *Prepackaged Plan of Reorganization of Security First Corp., Dated as of August 29, 2020*, filed contemporaneously herewith (the "Plan"). Pursuant to the Reorganization, SFC will become a wholly-owned subsidiary of ESW Capital, LLC ("ESW"). In connection with the Reorganization, the Debtor intends to pay the allowed amount of all administrative, priority and general unsecured claims in full, and to provide for the remainder of the proceeds paid by ESW as the Plan Sponsor for the Reorganization to be disbursed to the SFC Secured Creditors Trust in partial satisfaction of its prepetition secured claims against the Debtor under the senior secured promissory notes issued by the Debtor. The Plan also includes a provision which could provide for the distribution of further proceeds depending on the terms and timing of a future sale or monetization of intellectual property. In that event, such proceeds would be distributed first to the SFC Secured Creditors Trust until its claim is paid in full, then to holders of Allowed Common Stock Interests on a pro rata basis.

**BACKGROUND**

**A.    The Debtor's Business.**

6. Upon information and belief, the Debtor was formed in 2002 and entered the field of using patented and unpatented intellectual property to preserve the secrecy and confidentiality of electronic messaging and data.

7. During its existence, the Debtor has developed or acquired a portfolio of approximately one hundred patents, most of which relate to encryption technology, data security and its applications with respect to preserving the secrecy and confidentiality of electronic information. Despite this extensive portfolio, the Debtor has been unsuccessful in developing commercially viable applications for its technology.

8. In connection with an expansion of funding to the Debtor during the 2014-2015 timeframe, the Debtor entered into a relationship with IBM Corp., which the Debtor viewed as critical to its success, both from a technological and financial standpoint. The Debtor expended significant funds in an attempt to make the IBM relationship successful. To aid that effort, in early 2017, in connection with the equity and debt reorganization described below, the Debtor decided to replace its long-term CEO with a former IBM employee, James Varner. By the first quarter of 2019, the Company had not achieved the results it sought with IBM and the Board of the Debtor decided to terminate Mr. Varner. On May 31, 2019, IBM notified the Debtor that it was effectively terminating IBM's relationship with the Debtor and in July 2019, IBM formally terminated its relationship with SFC.

9. I was appointed President and Chief Executive Officer of the Debtor in November 2019. Around that time, the Debtor terminated almost all of its employees and the Debtor engaged a software developer in India to continue software development at a lower cost. The Debtor also attempted to upgrade its core (security) product as management emphasized that upgrades were necessary to compete in the marketplace. SFC's Board advised management that management should seek new investors to fund the Company or a sale of the Company if they could not find new investors. In February 2020, the secured lenders notified the Debtor that they would no longer provide funding to SFC.

10. SFC currently has three employees, each of whom is an officer of the company. I serve as President and CEO. Aysegul Berenson is the Chief Financial Officer. Rick Orsini is the Vice President for Software Development.

11. The Company is currently managed by a two person Board of Directors.

12. Due to the COVID-19 pandemic, the Debtor no longer maintains an office location. All three employees work remotely. The Debtor no longer has any hard assets or equipment of any value.

13. The Debtor maintains one bank account which holds its nominal remaining operating funds. The Debtor has been unable to pay the expenses associated with maintaining its intellectual property assets since the beginning of July 2020.

14. The Debtor's statement of financial affairs to be filed in this case indicates that the Debtor has generated total revenues of just $92,206 in the past two calendar years, and during that time has relied almost exclusively on funding from its secured lenders to fund its limited ongoing operations. Other than through the proposed reorganization transaction (and certain future monetization events for the patents, if any, subject to the terms of the IP Sale agreement during the seven-year period following confirmation of the Plan), the Debtor has no expectation of generating future revenue. As of the Petition Date, the Debtor estimates that it may possess federal net operating loss carryforwards in excess of $150 million, but I understand that the net operating loss carryforwards are subject to limitations and restrictions that may limit or even eliminate their availability.

**B.     Debtor's Capital Structure.**

15.    From the time of its formation in 2002 through February 2017 approximately $140 million was invested in or loaned to the Debtor, the last $70 million of which was in the form of secured debt.

16.    In February 2017, the Debtor completed an out-of-court equity and debt reorganization, in which (i) approximately $70 million of prior-invested equity was converted into a "home run" warrant, which warrant would have value only if the Debtor's value increased significantly from that date, and (ii) holders of the Company's then-existing secured debt of approximately $70 million converted their secured debt into the Company's new equity, and certain of the equity investors agreed to fund approximately $15 million of additional equity. The full additional equity commitment was completed in July 2018. Nevertheless, the Debtor's financial picture did not improve as anticipated, and shortly after the addition equity infusion was completed, SFC required additional funding to remain viable.

17.    Beginning in September 2018, certain of the equity investors (the "Secured Lenders") agreed to continue to fund the Debtor, but only pursuant to Promissory Notes secured by all of the assets of the Debtor. Between September 2018 and February 2020, the Secured Lenders loaned a total principal amount of $12,975,00 pursuant to such Secured Promissory Notes, which notes represent the Company's entire secured debt as of the Petition Date. As of the date hereof, the Debtor has approximately $25,000 in remaining cash on hand, and no means to repay its secured debt.

18.    On or before August 28, 2020, the Secured Lenders' Promissory Notes were assigned to the SFC Secured Creditors Trust, which now holds all of the secured debt of the Company.

19. On August 14, 2020, ESW purchased 43,700 shares of Series A Preferred stock in SFC, for $25,000. ESW is the sole holder of Series A Preferred Stock Interests. ESW is not an insider of the Debtor.

### C. Events Leading up to Bankruptcy Filing.

20. Beginning in the first quarter of 2020 through mid-May, management engaged in a comprehensive full-scale search for new investments in and/or a purchaser of the Debtor. In connection with this search, the Company canvassed a wide range of potential partners, including public companies, private companies, venture capitalists, investment bankers and private equity firms. Over time, the Company determined that it was unable to attract additional investment; no existing or potential investor was willing to serve as the lead investor for another round of investment. It became clear to the Debtor that a sale of the Debtor was the most realistic option, although most of the companies that were contacted had no interest in the Debtor because it lacked any existing customers. The Debtor eventually had discussions with several entities regarding proposals for a potential sale of the Company, including the proposal from ESW. In evaluating the proposals, SFC determined that the proposal from ESW represented the best possible scenario for SFC stakeholders, principally its secured and general unsecured creditors.

21. On May 27, 2020, after a lengthy series of negotiations, the Debtor entered into a Letter of Intent with ESW (the "ESW LOI"), in connection with a proposed transaction in which SFC would become a wholly-owned subsidiary of ESW as part of the Reorganization. The ESW LOI contemplated that the Debtor file a petition under Chapter 11 of the Bankruptcy Code and seek Court approval of the Reorganization through confirmation of the Plan.

22. The Debtor, ESW, and the SFC Secured Creditors Trust entered into a Restructuring Support Agreement (the "RSA") on August 29, 2020 pursuant to which they all

agreed to support the Restructuring Transaction which is set forth in the Plan. Pursuant to the RSA, ESW has agreed to provide DIP Financing of $1,000,000, to cover the ordinary course operating and administrative expenses associated with preserving the Debtor's operations and running a chapter 11 process through a plan effective date.

23. The Plan generally provides for ESW to provide consideration of (i) $6,000,000 in Cash to be funded by the Plan Sponsor on the Effective Date, plus (ii) additional Cash to be funded by the Plan Sponsor in an amount equal to the undrawn amount of the DIP Financing as of the Effective Date. That consideration will be distributed through the Plan to pay administrative, priority and unsecured creditors in full, and then to the SFC Secured Creditors Trust and the Officers, pursuant to the Officer Agreements (as discussed further below). Additional consideration may be payable to the Debtor's stakeholders from a future sale or monetization of SFC's intellectual property, if it occurs within seven years following confirmation of the Plan, subject to the terms and conditions of the IP Sale Agreement (as further described and attached to the Plan). The additional consideration, if any, would be distributed first to the SFC Secured Creditors Trust, and then if fully satisfied, to the Allowed Equity Interests on a pro rata basis.

24. Pursuant to the Plan, all existing equity of the Debtor will be retired, cancelled, extinguished and/or discharged and ESW will acquire 100% of the equity of the reorganized Debtor, in its capacities as the Plan Sponsor, DIP Lender (to the extent that it exercises the Subscription Option), and the Series A Preferred Stockholder (to the extent that it exercises the Series A Preferred Exchange Option). A detailed description of the Subscription Option is contained on page 46 of the Plan, and a detailed description of the Series A Preferred Exchange Option is contained on page 45 of the Plan.

25.     Upon the Effective Date of the Plan, and barring a default in connection with the DIP Financing, to the extent any amount of outstanding DIP Lender obligations remain after the DIP Lender exercises the Subscription Option, the remainder of the DIP obligations shall, at the option of the DIP Lender, either be repaid in cash funded and paid by the Plan Sponsor on the Effective Date, separately and in addition to the Cash Consideration being paid under the Plan on the Effective Date, or reduced on a dollar-for-dollar basis by agreement between the DIP Lender and the Plan Sponsor. In no event will the exercise of the Subscription Option, either in whole or in part, reduce the amount of the Cash Consideration paid by the Plan Sponsor.

26.     The Debtor is filing a motion to approve the RSA contemporaneously herewith, and is seeking confirmation of the Plan under the schedule included in the Solicitation Procedures Motion (as defined below), also filed herewith.

27.     As noted above, significant sums have been invested in SFC over an 18 year span. SFC stakeholders are in agreement that additional software development is necessary for SFC product upgrades, and SFC's existing investor base is unwilling to be the lead investor in any such funding. Moreover, absent entry into the Restructuring Support Agreement and filing of the Bankruptcy Case, there are no funds to pursue further business, and a high likelihood the Prepetition Lenders could simply foreclose on their collateral, an outcome which I believe would result in no recovery for unsecured creditors. Accordingly, SFC and its stakeholders all believe that Reorganization presents the best scenario for the Company, in order to preserve its assets, pay its creditors and to provide some return for its secured creditors.

**D.     Additional Matters Relevant to the Bankruptcy Case.**

28.     When it became apparent that the Debtor would not be able to attract additional investment, SFC's Board tasked its three officers-- Mr. Orsini, Ms. Berenson and me (hereinafter,

the "Officers")-- with finding a third-party buyer and negotiating a suitable transaction for the sale of the Company.  The Board orally agreed that the company would pay the Officers additional compensation in the form of consulting fees if an acceptable transaction was consummated, and the consulting fees would be payable as a percentage of the net proceeds received by the Company through the transaction.  The Restructuring Transaction negotiated with ESW was accepted by the Board in the form set forth in the ESW LOI, after which the Board negotiated the appropriate consulting fee percentages with the Officers and required that they remain with the Company through the entire Chapter 11 reorganization process.  Following these negotiations, each of the Officers entered into written agreements with SFC (the "Officer Agreements") on August 29, 2020,[2] pursuant to which SFC agrees to pay a percentage of the Remaining Cash (as defined in the Plan) to each of the Officers.   The Officer Agreements also contain mutual releases. Following the execution of the Officer Agreements, all of the then-existing members of the Company's Board  resigned from their positions, and two current officers of SFC, Rick Orsini (V.P., Software Engineering) and I (CEO) have been appointed as SFC's new Board members for the duration of the Bankruptcy Case.

29. To facilitate its transition into a debtor-in-possession operating under Chapter 11 of the Bankruptcy Code, the Company has taken or expects to open a debtor-in-possession bank account with an approved financial institution under the guidelines of the Office of the United States Trustee.  Any funds held in the Company's current bank account as of the petition date will be transferred to the new debtor-in-possession account.

30. As noted above, the Company no longer maintains an office for conducting its business, and its employees work remotely.  Accordingly, the Company does not have or expect

---

[2] The board that negotiated the Officer Agreements consisted of the same board members who agreed to the consulting fees in the event of a successful transaction.

9

to incur in the future any utility, insurance or property tax obligations. The Company's 401k plan has been terminated. Furthermore, the Company is not in possession of any funds which constitute tax withholdings, with respect to either itself and its employees. The Company does provide health benefits to its three remaining employees, which are paid current as of the Petition Date. These circumstances limit the need for some of the traditional first day relief that debtors-in-possession in Chapter 11 cases typically require.

31. To enable the Debtor to continue its limited operations through confirmation of its proposed Plan, and to avoid adverse effects from its chapter 11 filing, the Debtor will be filing the motions (the "First Day Motions") described below.

32. In connection with the preparation for this Bankruptcy Case, I have reviewed each of the First Day Motions referenced below. The First Day Motions were prepared with my input and assistance or the input of the other employees and bankruptcy counsel. I believe the information in the First Day Motions is accurate and correct. As set forth more fully below, I believe that the entry of orders granting the relief requested in these motions and applications is critical to the Debtor's reorganization efforts.

### 1. **DIP Financing Motion.**

33. As more fully set forth above, the Company immediately needs post-petition financing to pay its employees, continue its limited operations, and administrative expenses which may accrue through confirmation of the Plan. Without access to debtor-in-possession financing, the Debtor will not be able to meet the cash needs of its business and the projected costs of the Chapter 11 case.

34. In advance of this chapter 11 filing, the Debtor engaged in negotiations with its secured creditors and other parties in interest, but none were willing to provide any further

financing to the Debtor. In particular, prior to entering into the letter of intent with ESW, I spoke to at least two other private equity firms to ascertain the general terms by which they might provide a loan to the Debtor, but none were willing to provide a loan given the Debtor's lack of ongoing revenue or other hard assets to serve as collateral for such a loan. Pursuant to the RSA, ESW is wiling to provide DIP Financing to the Debtor on agreeable terms so that it can complete its contemplated restructuring.

35. ESW Capital has agreed to provide post-petition financing to cover the costs associated with preserving the Debtor's operations and running a chapter 11 process through a plan effective date. The DIP Financing provides for funding up to $1,000,000 through an approved budget, and does not have origination or other fees associated with it. Moreover, as discussed above, upon the Effective Date of the Plan, if any amount of the DIP Financing Claim remains outstanding after the DIP Lender exercises the Subscription Option, then (i) the Plan Sponsor shall repay such outstanding amount in cash on the Effective Date, which cash shall be separate from and in addition to the Plan Consideration; or (ii) the DIP Lender may (at its sole election) consent to the offset or other non-cash satisfaction of the DIP Financing Claim by the Plan Sponsor until the remaining unpaid amount of the DIP Financing Claim is reduced to $0. In no event will the partial exercise of the Subscription Option reduce the amount of the Plan Consideration or DIP Financing to the Debtor.

36. The DIP Facility represents the best and only source of financing available to the Debtor under the circumstances, and was negotiated at arm's length with the DIP Lender and the pre-petition secured lenders, resulting in terms that the Debtor submits are reasonable and appropriate to meet the Debtor's financing needs during the Chapter 11 Case.

37. The Company is unlikely to obtain financing to fund its case and preserve its assets on terms more favorable than those offered by the DIP Lender under the DIP Facility and has been unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. I also do not believe that the Debtor is likely to obtain secured credit under section 364(c) of the Bankruptcy Code on equal or more favorable terms than those offered by the DIP Lender under the DIP Facility. As discussed above, the DIP Facility is connected with the RSA.

### 2. Motion to Approve Confirmation Procedures.

38. The Debtor filed a pre-packaged plan of reorganization and a disclosure statement (the "Disclosure Statement") shortly after the Petition Date. It is in the best interest of the Debtor's estate and all stakeholders that the Debtor move to seek joint approval of the Disclosure Statement and confirmation of the Plan quickly, so that the consensual Plan negotiated with the SFC Secured Creditors Trust (which pays unsecured creditors in full) can go effective with as modest an administrative expense burden as possible.

39. Accordingly, contemporaneously with the filing of its Chapter 11 petition, the Debtor will be filing a motion seek entry of an order: (i) scheduling a combined hearing to consider confirmation of the Plan and approval of the Disclosure Statement; (ii) establishing deadlines and procedures to object to the same; and (iii) approving the form and manner of notice of confirmation.

### 3. Bar Date Motion.

40. The Debtor seeks entry of an order setting the applicable bar dates to submit proofs of claim in this Chapter 11 Case. The Debtor intends to request that the Court enter an order (i) establishing September 30, 2020 as the general bar date in this case and February 28, 2021 as the

governmental claims bar date. The Debtor intends to mail its Bar Date Notice within five days after entry of the propose order granting the Bar Date Motion. Under the Debtor's timeline, all known claimants will have thirty (30) days mailed notice to submit a claim at or prior to the propose general bar date. Setting a bar date at the outset of the case is essential to confirming the Plan within the timeframe proposed under the Solicitation Procedures Motion, because the Debtor and the Plan Sponsor need to know the universe of potential claims to be addressed by the Plan prior to confirmation.

4. **Employee Wage and Benefit Motion.**

37. In the ordinary course of their business, the Debtor incurs payroll obligations and provide health benefits to its employees for the performance of services. As previously noted, as of the Petition Date, Debtor employed three (3) employees, each of whom is an officer of the Company (collectively, the "Employees").

38. Prior to the Petition Date and in the ordinary course of business, the Debtor typically paid obligations relating to wages, salary and compensation for the Employees (collectively, the "Wage Obligations") monthly, during the last week of the month. The Debtor's current estimated monthly gross payroll is $43,408.34. Following the Debtor's customary payroll schedule, the next payroll is due to be paid on August 28, 2017. This payroll will be almost entirely for prepetition Wage Obligations. The Debtor requests the authority to pay Pre-Petition Wage Obligation in the ordinary course of business in an amount not to exceed $50,000 and to pay all Wage Obligations that arise post-petition in the ordinary course of business.

39. The Debtor is required by law to withhold from the Wage Obligations amounts related to federal, state, and local income taxes, as well as social security and Medicare taxes (collectively, the "Withholding Taxes") and to remit the same to the appropriate taxing authorities

(collectively, the "Taxing Authorities").  In addition, the Debtor is required to pay a portion of the payroll taxes from its own funds on account of social security and Medicare taxes and to pay, based on a percentage of gross payroll and subject to state-imposed limits, additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively, the "Employer Payroll Taxes" and, together with the Withholding Taxes, the "Payroll Taxes").  The Debtor requests the authority to pay these the pre-petition Payroll Taxes in the ordinary course of business.

40.	In addition, the ordinary course of business, the Debtor provides health and welfare benefits to its Employees.  The health insurance benefits include medical, dental and vision insurance (the "Health Insurance Benefits").  The Health Insurance Benefits are provided through group policies maintained by United Healthcare, Principle and Guardian.  The monthly premiums for the Health Insurance Benefits have been paid current through the Petition Date.  However, the Debtor requests authority to pay any pre-petition charges necessary to continue the Health Insurance Benefits it provides, in the event that it is presented with a prepetition charge that has not been paid.  The Debtor also seeks authority to direct its bank to honor any check issued to the providers of Health Insurance Benefits that have not been cashed as of the Petition Date.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated:  August 31, 2020                                           */s/ Pankaj Parekh*
                                                                                    Pankaj Parekh, CEO