## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| SECURITY FIRST CORP.,[1] | ) |
| | ) Case No. 20-20-12053 (BLS) |
| Debtor. | ) |

### DECLARATION OF PANKAJ PAREKH IN
### SUPPORT OF APPROVAL OF DISCLOSURE STATEMENT
### AND CONFIRMATION OF PLAN OF REORGANIZATION

I, Pankaj Parekh, being duly sworn, declare under penalty of perjury as follows:

1. I am the President and Chief Executive Officer of Security First Corp. ("SFC" or "Company" or the "Debtor") in this Chapter 11 case (the "Bankruptcy Case").

2. I am over the age of 18 and am authorized to submit this Declaration. If called as a witness, I could and would completely testify to the facts set forth in this Declaration, which-- for a number of matters, including matters prior to my employment as an officer of the Company as set forth primarily in paragraphs 8, 15, 16 and 17 below-- is based on information and belief formed through the review of documents and conversations with others, not my personal knowledge.

3. I am familiar with the Company's most recent history and the status of its assets and financial affairs.

---

[1] The Debtor's last four digits of its U.S. federal tax identification number are 9286. The official mailing address for the Debtor is 27762 Antonio Parkway, Suite L1 #442, Ladera Ranch, CA 92694, although the Debtor no longer maintains a physical office.

## BACKGROUND FACTS

### A. The Debtor's Business.

4. The Debtor was formed in 2002 and entered the field of using patented and unpatented intellectual property to preserve the secrecy and confidentiality of electronic messaging and data. During its existence, the Debtor has developed or acquired a portfolio of approximately one hundred patents, most of which relate to encryption technology, data security and its applications for preserving the secrecy of electronic information. Despite this extensive portfolio, the Debtor has been unsuccessful in developing commercially viable applications for its technology.

5. In connection with an expansion of funding to the Debtor during the 2014-2015 timeframe, the Debtor entered into a relationship with IBM Corporation, which the Debtor viewed as critical to its success, both from a technological and financial standpoint. The Debtor expended significant funds in an attempt to make the IBM relationship successful. To aid that effort, in early 2017, in connection with the equity and debt reorganization described below, the Debtor replaced its long-term CEO with a former IBM employee. By the first quarter of 2019, the Company had not achieved the results it sought with IBM and the Board of the Debtor decided to terminate the former IBM employee as CEO. On May 31, 2019, IBM notified the Debtor that it was effectively terminating IBM's relationship with the Debtor, which was then formally terminated in July 2019.

6. I was appointed President and CEO of SFC in November 2019. By that time, the Debtor had terminated almost all of its employees and engaged a software developer in India to continue software development at a lower cost. SFC also attempted to upgrade its core (security) product as management emphasized that upgrades were necessary to compete in the marketplace.

SFC's Board advised management to seek new investors to fund the Company or a sale of the Company if they could not find new investors. In February 2020, the Company's secured lenders notified SFC that they would no longer provide funding to SFC.

### B. The Debtor's Capital Structure.

7. From the time of its formation in 2002 through February 2017, approximately $140 million was invested in or loaned to the Debtor, the last $70 million in the form of secured debt.

8. In February 2017, the Debtor completed an out-of-court equity and debt reorganization, in which (i) approximately $70 million of prior-invested equity was converted into a "home run" warrant, which warrant would have value only if the Debtor's value increased significantly from that date, (ii) holders of the Company's then-existing secured debt of approximately $70 million converted their secured debt into the Company's new equity, and (iii) certain of the equity investors agreed to fund approximately $15 million of additional equity. The full additional equity commitment was completed in July 2018. Nevertheless, the Debtor's financial picture did not improve as anticipated, and shortly after the additional equity infusion, SFC required further funding to remain viable.

9. Beginning in September 2018, certain of the equity investors (the "Secured Lenders") agreed to continue to fund SFC, but only pursuant to Promissory Notes secured by all of the assets of SFC. Between September 2018 and February 2020, the Secured Lenders loaned a total principal amount of $12,975,000 pursuant to such Secured Promissory Notes, which notes represent the Company's entire secured debt as of the Petition Date. To date, SFC has not achieved profitability on a GAAP or cashflow basis.

C. **Events Leading to Bankruptcy.**

10.     From the first quarter of 2020 through mid-May, management engaged in a comprehensive full-scale search for new investments in or a purchaser of SFC. In connection with this search, the Company canvassed a wide range of potential partners, including public companies, private companies, venture capitalists, investment bankers and private equity firms. Over time, the Company determined that it was unable to attract additional investments; no existing or potential investor was willing to serve as the lead investor for another round of investment. It became clear to SFC that a sale of the Company was the most realistic option, although most of the companies that were contacted had no interest in the Company because it lacked any existing customers. SFC eventually had discussions with several entities regarding proposals for a potential sale of the Company, including a proposal from ESW Capital, LLC ("ESW"). In evaluating the proposals, SFC determined that the proposal from ESW represented the best possible scenario for SFC stakeholders, principally its secured and unsecured creditors.

11.     On May 27, 2020, after a lengthy series of negotiations, the Company entered into a Letter of Intent with ESW (the "ESW LOI"), for a proposed transaction in which SFC would become a wholly-owned subsidiary of ESW as part of a reorganization (the "Reorganization"). The ESW LOI contemplated that the Company would file a petition under Chapter 11 of the Bankruptcy Code and seek Court approval of the Reorganization through confirmation of the Plan. After further negotiations, the Debtor, ESW, and the SFC Secured Creditors Trust entered into a Restructuring Support Agreement (the "RSA") on August 29, 2020, pursuant to which they all agreed to support the Restructuring Transaction set forth in the Plan.

**D. The Debtor's Bankruptcy.**

12. On August 31, 2020 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the "Bankruptcy Code. The Debtor is operating its business and managing its properties as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code. No official committee has been appointed in this Chapter 11 Case.

13. The Debtor filed its *Prepackaged Chapter 11 Plan of Security First Corp. Dated August 29, 2020* (the "Plan") and its *Disclosure Statement for Prepackaged Chapter 11 Plan of Security First Corp. Dated August 29, 2020* (the "Disclosure Statement") on the Petition Date. On September 3, 2020, the Court entered its *Order Approving Debtor's Motion for Entry of (i) and Order (a) Scheduling a Combined Hearing on Approval of Disclosure Statement and Confirmation of Debtor's Plan of Reorganization; (b) Establishing the Deadlines and Procedures for Objections Thereto; (c) Establishing Notice Procedures; and (d) Granting Related Relief* [Docket No. 27].

14. Prior to the Petition Date, Sullivan Hazeltine Allinson LLC ("SHA"), the Debtor's counsel, caused the Plan, the Disclosure Statement, and the appropriate ballot to be transmitted to the Holder of the Class 1 Consenting Lender Claim and the holder of the Class 5 Series A Preferred Stock Interests, the only classes entitled to vote to accept or reject the Plan.

15. The Debtor filed the Amended Plan on October 13 2020.

16. On October 13, 2020, the Debtor filed the *Declaration of William A. Hazeltine Regarding Voting and Tabulation of Ballots Accepting and Rejecting the Pre-Packaged Plan of Reorganization of Security First Corp.* (the "Voting Declaration") [Docket No. 88] attesting to the tabulation of the ballots received by SHA from the Holder of the Class 1 Consenting Lender

5

Claim and the Holder of the Class 5 Series A Preferred Stock Interests and attesting to the results of the tabulation as follows:

  a. <u>Class 1</u>.  On August 29, 2020, the sole Holder of the Class 1 Consenting Lender Claim submitted its Ballot in the amount of $14,499,472.10 and voted to accept the Plan.  The Holder of the Class 1 Consenting Lender Claim did not opt-out of the third-party releases pursuant to Section 11.5 of the Plan.

  b. <u>Class 5 (Unsecured Litigation Claims)</u>.  On August 29, 2020, the sole Holder of the Class 5 Series A Preferred Stock Interests submitted a Ballot voting its 43,700 shares of Series A Preferred Stock to accept the Plan.  The Holder of the Class 5 Series A Preferred Stock Interests did not opt-out of the third-party releases pursuant to Section 11.5 of the Plan.

  17. A combined hearing to consider approval of the Disclosure Statement and confirmation of the Amended Plan is scheduled for October 15, 2020 at 12:00 p.m. (the "<u>Confirmation Hearing</u>").

## **<u>DECLARATION IN SUPPORT OF CONFIRMATION</u>**

  18. This Declaration is divided into two Sections.  Section I establishes the Plan's compliance with each of the applicable requirements for confirmation under Section 1129(a) of the Bankruptcy Code.  Section II establishes that certain of the discretionary provisions of the Plan, including exculpations, injunctions and releases provided for in the Plan, are appropriate and should be approved.

**I.** **<u>The Plan Satisfies Each Requirement for Confirmation</u>**

  19. I have reviewed the Plan and related materials and believe, upon consultation with SFC's advisors, that the Plan satisfies all requirements for confirmation set forth in Section 1129 of the Bankruptcy Code.

**A.  The Plan Complies with the Bankruptcy Code (11 U.S.C. § 1129(a)(1)).**

20.     I understand that Bankruptcy Code Section 1129(a)(1) requires that a plan comply with the Bankruptcy Code's "applicable provisions."  Upon consultation with SFC's advisors, I believe that the Plan complies with all applicable provisions of the Bankruptcy Code.

    i.  Proper Classification of Claims and Interests.

21.     I understand that Section 1122 of the Bankruptcy Code requires that claims or interests in a class be substantially similar to other claims or interests in that class.

22.     Article III of the Plan designates, but does not classify, claims of the type described in Section 507(a)(1) of the Bankruptcy Code (Administrative Expense Claims) and 507(a)(8) of the Bankruptcy Code (Priority Tax Claims).  The Plan's classification of all of the Claims and Interests is proper and consistent with Section 1122 of the Bankruptcy Code because each Claim or Interest classified in each Class is substantially similar to the other Claims or Interests in that Class.  The Plan thereby satisfies Section 1123(a)(1) of the Bankruptcy Code.

23.     I understand that the classification of Claims and Interests under the Plan is reasonable and necessary to implement the Plan and that all similar claims are classified in the same class.

  a. Class 1 classifies the claims of the SFC Secured Lenders Trust, the holder of all prepetition secured debt.

  b. Secured claims against the Debtor other than the claims of the SFC Secured Lenders Trust are included in Class 2.  The Debtor is not aware of any such claims.

  c. Priority claims other than priority tax claims are classified in Class 3.

  d. The claims of all general unsecured creditors are classified in Class 4.

  e. All Series A Preferred Stock Interests are classified in Class 5.

    f.    All Common Stock Interests are classified in Class 6.

    g.    All Other Interests, including warrants, are classified in Class 7.

    ii.    <u>Specified Classes of Unimpaired Claims (11 U.S.C. § 1123(a)(2))</u>.

24.    I understand Section 1123(a)(2) of the Bankruptcy Code requires that a plan specify classes of unimpaired claims or interests. Article V of the Plan satisfies this requirement by specifying that Class 2 (Other Secured Claims), Class 3 (Priority Non-Tax Claims) and Class 4 (General Unsecured Claims) are unimpaired.

    iii.    <u>Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3))</u>.

25.    I understand that Section 1123(a)(3) of the Bankruptcy Code requires that a plan specify the treatment of classes of impaired claims or interests. Article V of the Plan sets forth the treatment of each impaired Class of Claims and Interests.

    iv.    <u>No Discrimination (11 U.S.C. § 1123(a)(4))</u>.

26.    I understand that Section 1123(a)(4) of the Bankruptcy Code requires that a plan provide for the same treatment of each claim or interest within a particular class. Article V of the Plan provides that the treatment of each Claim or Interest in each separate Class is the same as the treatment of all other Claims or Interests in such Class, unless the particular Holder of a Claim or Interest has agreed to a less favorable treatment.

    v.    <u>Implementation of the Plan (11 U.S.C. § 1123(a)(5))</u>.

27.    I understand that Section 1123(a)(5) of the Bankruptcy Code requires that a plan provide adequate means of implementing the plan. I believe that Article VI of the Plan provides adequate means for implementing the Plan as follows: (i) Section 6.1 of the Plan provides that the Debtor will maintain its corporate existence; (ii) Section 6.2 of the Plan permits the Plan Sponsor to elect directors for the Reorganized Debtor; (iii) Section 6.3 of the Plan provides for

the appointment of a Distribution Trustee; (iv) Section 6.5(c) of the Plan provides for the cancellation of existing Interests; (v) Section 6.5(d) of the Plan provides for the issuance of New Equity; (vi) Section 6.5(e) of the Plan provides for the funding of the Cash Consideration; (vii) Section 6.5(g) of the Plan provides for the vesting of the Distribution Trust Assets, including the Cash Consideration, in the Distribution Trust; (viii) Section 6.5(h) of the Plan provides a procedure for the sale of intellectual property after the Effective Date; (ix) Section 6.7 of the Plan provides for the preservation of Rights of Action; (x) Article VII of the Plan provides procedures for objecting to Claims and making distributions to holders of Allowed Claims; and (xi) Section 10.2 of the Plan provides for the vesting of the Debtor's assets in the Reorganized Debtor.

### vi. No Nonvoting Equity Securities (11 U.S.C. § 1123(a)(6)).

28. I understand that Bankruptcy Code Section 1123(a)(6) requires that a plan provide for a reorganized corporate debtor's charter to include provisions (i) prohibiting the issuance of non-voting equity securities and (ii) providing for an "appropriate distribution" of voting power among securities possessing voting power. Section 6.1 of the Plan provides that the Reorganized Debtor's Charter Documents shall prohibit the issuance by the Reorganized Debtor of nonvoting securities to the extent required under section 1123(a)(6) of the Bankruptcy Code. Moreover, the voting power of the Reorganized Debtor will be appropriately distributed because ESW will own all the equity of the Reorganized Debtor in its capacities as Plan Sponsor, DIP Lender and/or the Holder of the Series A Preferred Stock Interests.

### vii. Selection of Officers, Directors or Trustee (11 U.S.C. § 1123(a)(7)).

29. I understand that Bankruptcy Code Section 1123(a)(7) provides that a plan must "contain only provisions that are consistent with the interests of creditors and equity security

holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the plan and any successor to such officer, director or trustee."

30. The Plan satisfies this requirement because the Plan Supplement discloses the names of the Reorganized Debtor's officers and sole director. None of the Debtor's current officers and directors will be officers or directors of the Reorganized Debtor.

### B. Disclosure and Solicitation (11 U.S.C. § 1129(a)(2)).

31. I understand that Bankruptcy Code Section 1129(a)(2) requires that a plan proponent comply with the applicable provisions of the Bankruptcy Code to ensure that a plan proponent has complied with the disclosure and solicitation requirements of Bankruptcy Code Section 1125. Prior to the Petition Date, the Debtor transmitted the Plan, the Disclosure Statement and the appropriate ballot to the sole Holder of the Class 1 Consenting Lender Claim and the sole Holder of the Class 5 Series A Preferred Stock Interests, the only impaired classes entitled to vote on the Plan.

### C. Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3)).

32. I understand that Bankruptcy Code section 1129(a)(3) requires that a plan be "proposed in good faith and not by any means forbidden by law". The Debtor, ESW and the Secured Lenders negotiated the terms of the RSA and the Plan extensively for three months for the purpose of maximizing the value of the Debtor's assets for the benefit of its constituents. Consummation of the Plan will permit the Debtor to make distributions to the Holders of undisputed claims shortly after the Effective Date. Moreover, pursuant to the Plan, the SFC Secured Creditors Trust will subordinate its Class 1 Consenting Lender Claim so that all other Holders of Allowed Claims can receive payment in full.

### D. Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4)).

33. I understand that Bankruptcy Code Section 1129(a)(4) requires that any payments by a debtor "for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case" be approved by the Court as reasonable. Section 4.1 of the Plan provides that only Holders of Allowed Administrative Expense Claims will receive payment on account of their Claims. Sections 4.1 and 4.2 also requires claimants asserting Administrative Expense Claims, including Professionals and other entities seeking an award from the Court for compensation for services rendered and/or reimbursement of expenses through and including the Effective Date, to file applications requesting allowance and payment of those Claims within 30 days after the Effective Date.

### E. Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5)).

34. The Plan Supplement discloses the names of the Reorganized Debtor's Officers and Directors. No insider of the Debtor will be employed or retained by the Reorganized Debtor.

### F. No Rate Changes (11 U.S.C. § 1129(a)(6)).

35. I understand that Bankruptcy Code Section 1129(a)(6) requires that a debtor whose rates are subject to government regulation obtain appropriate approval of any rate change proposed in a plan, or that the rate change be expressly conditioned on such approval. The transactions contemplated by the Plan do not involve any rates established, approved by, or otherwise subject to, any governmental regulatory commission.

### G. Best Interests of Creditors Test (11 U.S.C. § 1129(a)(7)).

36. I understand that Bankruptcy Code Section 1129(a)(7) requires that holders of impaired claims or interests who do not vote to accept the plan receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that

is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7.

37.     As discussed above, the Debtor's management engaged in a comprehensive full-scale search for new investments in or a purchaser of the Debtor's assets prior to the Petition Date.  Management was unable to locate additional investors and it became clear that a sale of the Debtor was the most realistic option.  The Debtor received a number of proposals in connection with a possible sale and determined that the best available option was the proposal from ESW, which is embodied in the Plan.

38.     The Plan generally provides for ESW to provide consideration of $6,000,000 million as the Plan Sponsor, plus additional cash to be funded by the Plan Sponsor in an amount equal to the undrawn portion (as of the Effective Date) of $1,000,000 of DIP financing.  These funds will be used to pay all Claims against the Debtor in full, other than the Class 1 Claim of the Consenting Lender, which agreed to subordinate its claim in order for all other creditors holding Allowed Claims to be paid in full.  The Plan also provides for the proposed sale or other monetization of the Debtor's Intellectual Property in order to maximize its value.  The Intellectual Property comprises the Debtor's only asset of material value in a liquidation scenario.  The Debtor believes that the proposed sale process or other monetization of the Intellectual Property will require the retention of a consultant at a significant expense.  The Reorganized Debtor and certain beneficiaries of the Distribution Trust are contemplated to share in the proceeds of any sale or other monetization of the Intellectual Property on the terms set forth in the IP Sale Agreement and the Distribution Trust will distribute the funds it receives in accordance with the Plan.

39. The Debtor will have virtually no cash available if the Plan is not confirmed. Accordingly, I understand that in a chapter 7, the trustee would have no readily available source of cash for payments to creditors and no cash available to fund the liquidation of the Debtor's assets other than a $20,000 carve out from the DIP Financing. I don't believe this would be sufficient for a trustee to conduct an order sale of the Intellectual Property and would likely result in a fire sale of the Intellectual Property that would generate minimal, if any, proceeds. In addition, since the Intellectual Property is fully encumbered by the pre-petition liens of the SFC Secured Creditors Trust and the priming lien of the DIP Lender, there will be no unencumbered assets for a chapter 7 trustee to sell.

40. Further, I expect that SFC will borrow at least $400,000 from the DIP Lender during the Chapter 11 Case. The Debtor will not be required to repay any amounts borrowed from the DIP Lender if the Plan is confirmed and becomes effective. In a chapter 7, the trustee would be required to satisfy the outstanding balance on the DIP loan before making any distributions to the Debtor's other creditors.

41. Based on the foregoing and the liquidation analysis attached to the Disclosure Statement as Exhibit A, I believe that in a chapter 7, the chapter 7 trustee would either elect to abandon the Intellectual Property or the DIP Lender and/or the SFC Secured Creditors Trust would foreclose on the Debtor's assets. In either event, no Holders of other Claims or Interests would receive any recovery. In contrast, the Plan provides for payment of all Allowed Claims other than the Claim of the Consenting Lender in full, and leaves open the possibility that the Holders of Class 6 Common Stock may receive some distribution if the IP Recovery is sufficient to satisfy the Consenting Lender Claim in full. It is likely that no Holders of Claims or Interests, other than perhaps the SFC Secured Creditors Trust, would receive any recovery in a chapter 7.

### H. Acceptance of Plan by Impaired, Voting Classes (11 U.S.C. § 1129(a)(8)).

42.     I understand that Bankruptcy Code Section 1129(a)(8) requires that each class of claims and interests established under a plan either accepts the plan or is not impaired under the plan. I further understand that Classes 7 and 8 are deemed to reject the Plan. However, I understand that the Plan satisfies other sections of the Bankruptcy Code that will allow the Plan to be confirmed.

### I. Treatment of Administrative and Priority Tax Claims (11 U.S.C. § 1129(a)(9)).

43.     I understand that Sections 1129(a)(9)(A), (B) and (C) of the Bankruptcy Code contain certain requirements concerning the payment of priority claims. Sections 4.1, 4.4, and 5.1.3 of the Plan satisfy these requirements by providing that, unless they have agreed to a different treatment, Holders of Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Other Priority Claims will receive Cash in an amount equal to the amount of their Allowed Claims as soon as practicable after the later of the Effective Date and the date such Claim becomes an Allowed Claim.

### J. Acceptance by at Least One Impaired Class (11 U.S.C. § 1129(a)(10)).

44.     I understand that Bankruptcy Code Section 1129(a)(10) provides that, if a class is impaired under a plan, at least one impaired class has voted to accept the plan not including the votes of insiders. The only Class of Impaired Claims—the Class 1 Consenting Lender Claim—voted to accept the Plan. The only Holder of a Class 1 Claim is the SFC Secured Creditors Trust. The beneficial owners of the SFC Secured Creditors Trust are all insiders of the Debtors. Accordingly, there are no non-insider Holders of Impaired Claims. Given that there are no non-insider Holders of Impaired Claims, I understand that, because the only Impaired Class of Claims voted to accept the Plan, the Plan satisfies Bankruptcy Code Section 1129(a)(10).

### K. The Plan is Feasible (11 U.S.C. § 1129(a)(11)).

45.     I understand that Bankruptcy Code Section 1129(a)(11) requires that confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor, or any successor to the Debtor (unless such liquidation or reorganization is proposed in the plan). I believe this requirement is satisfied because the Plan contemplates the funding of all Consideration by the Plan Sponsor on the Effective Date, and therefore creditor recoveries are not impacted by the Reorganized Debtor's post-Effective Date feasibility.

### L. Payment of Fees (11 U.S.C. § 1129(a)(12)).

46.     I understand that Bankruptcy Code Section 1129(a)(12) requires that all fees payable to the United States Trustee are paid or that the plan provides for their payment on the effective date of the plan. Section 4.3 of the Plan provides that "[a]ll fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code ("Quarterly Fees") prior to the Effective Date shall be paid by the Debtor on the Effective Date. After the Effective Date, the Debtor, the Reorganized Debtor and the Distribution Trustee shall be jointly and severally liable to pay any and all Quarterly Fees when due and payable. The Debtor shall file all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee. After the Effective Date, the Distribution Trust shall file quarterly reports with the Bankruptcy Court when they become due, in a form reasonably acceptable to the U.S. Trustee, which reports shall include a separate schedule of disbursements made by the Reorganized Debtor during the applicable period, attested to by the Reorganized Debtor. Each and every one of the Debtor, the Reorganized Debtor and the Distribution Trustee shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of the Debtor's case being

closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code." Accordingly, the Plan satisfies Section 1129(a)(12) of the Bankruptcy Code.

### M. Continuation of Retiree Benefits (11 U.S.C. § 1129(a)(13)).

47. I understand that Bankruptcy Code Section 1129(a)(13) requires that a plan provide for the continuation of retiree benefits for the duration of the period that the debtor has obligated itself to provide such benefits. Section 1129(a)(13) is inapplicable because the Debtor is not and will not be obligated to pay retiree benefits.

### N. Sections 1129(a)(14)-(16) of the Bankruptcy Code are Inapplicable.

48. I understand that Sections 1129(a)(14) and (15) of the Bankruptcy Code are not applicable because they only apply to individual debtors. SI understand that Section 1129(a)(16) is not applicable because SFC is a moneyed business and a commercial corporation.

### O. The Plan is Fair and Equitable; No Unfair Discrimination (11 U.S.C. § 1129(b)).

49. I understand that, in order to confirm the Plan over a dissenting impaired Class under Section 1129(b) of the Bankruptcy Code, the Court must find that the Plan does not discriminate unfairly and is fair and equitable with respect to each Class of Claims or Interests that is impaired under, and has not accepted, the plan.

50. The Plan leaves open the possibility that the Holders of Class 6 Common Stock Interests may receive some distribution if the IP Recovery is sufficient to satisfy the Consenting Lender Claim in full. Class 7 (Other Equity Interests) will not retain any value or receive any distribution under the Plan and, I understand, are deemed to reject the Plan. I understand that the Plan does not unfairly discriminate against Holders of Interests in Classes 6 and 7. Class 6 includes all Holders of Common Stock Interests and Class 7 includes Holders of all Interests

other than Preferred Stock Interests and Common Stock Interests. Accordingly, I believe a reasonable basis exists for separately classifying the Interests in Classes 6 and 7.

51. I understand that the Plan is fair and equitable with respect to Classes 6 and 7 because no holder of a Claim or Interest that is junior to the Interests in Classes 6 and 7 will receive any property on account of such Interests.

### P. The Plan Complies with the Other Provisions of Section 1129 (11 U.S.C. §§1129(c)-(e)).

52. The Plan is the only plan on file presented for confirmation in the Chapter 11 case. The principal purpose of the Plan is not the avoidance of taxes or Section 5 of the Securities Act of 1933. Rather the principal purpose of the Plan is the successful reorganization of SFC and the payment in full of all creditors other than the SFC Secured Creditors Trust in accordance with the Plan. I understand that Bankruptcy Code Section 1129(e) is not applicable because the Chapter 11 Case is not a small business case within the meaning of the Bankruptcy Code.

### II. The Discretionary Provisions of the Plan are Appropriate and Should be Approved Under Section 1123(b).

53. I understand that Bankruptcy Code Section 1123(b) provides that a plan may include, among other things, "any other appropriate provision not inconsistent with the applicable provisions of this title." I understand that the Plan contains a number of standard discretionary provisions such as (i) the assumption and rejection of executory contracts and unexpired leases, (ii) a waiver of Bankruptcy Rule 3020(e), and (iii) the Court's retention of jurisdiction. The Plan also contains (i) a discharge of the Debtor, (ii) an injunction prohibiting the perfection, collection of enforcement of claims against SFC arising before the Effective Date (other than in accordance of the Plan) or otherwise interfering with the Plan, (iii) exculpation of

the Debtor, its officers, directors, employees, equity holders and agents from liability for Claims arising during the period from the Petition Date through the Effective Dated for actions taken related to the Chapter 11 Case, (iv) a release by the Debtor of the Reorganized Debtor, the Consenting Lender, and ESW in its capacities as Plan Sponsor, DIP Lender, and its respective directors, officers, agents, attorneys, accountants, consultants, equity holders, financial advisors, investment bankers, professionals, experts, and employees (the "Released Parties"); and (v) a release of the Released Parties by (a) Creditors in Unimpaired Classes; (b) Creditors in Impaired Classes that did not opt out of the releases, and (iii) Interest Holders that received a Solicitation Package and did not opt-out of the Releases.

### A. The Release, Exculpation and Injunction Provisions are Appropriate and Should Be Approved.

54.     I believe that the release and exculpation provisions are appropriate under the circumstances of this case. The Plan was negotiated in good faith with a high degree of transparency and the release and exculpation are necessary to protect those parties that played a critical role in the Chapter 11 Case and the Plan process and will participate in the implementation and consummation of the Plan.

55.     I understand that the discharge injunction is appropriate, consistent with Section 524(a) of the Bankruptcy Code, and necessary to prevent third-parties from circumventing the Plan.

### B. The Plan Complies with Bankruptcy Code Section 1123(c) and (d).

56.     I understand that Section 1123(c) of the Bankruptcy Code is inapplicable because the Debtor is not an individual.

57. I understand that Bankruptcy Code Section 1123(d) provides that "if it is proposed in a plan to cure a default, the amount necessary to cure the default shall be determined in accordance with the underlying agreement and nonbankruptcy law." Pursuant to the Plan, SFC is rejecting all executory contracts and unexpired leases other than the Officers Agreements, an executory contract with UnitedHealthcare (the "UHC Contract"), and any contract identified on the Schedule of Assumed Contracts and Unexpired Leases, as amended prior to the Effective Date. Section 8.2 of the Plan, with the consent of the Officers, expressly provides for the treatment of the Officers' Claims arising under the Officers Agreements. UnitedHealthcare has expressly consented to the assumption and assignment of the UHC Contract to the Distribution Trust and agrees that there are no defaults under the UHC Contract. Any contract added to the Schedule of Assumed Contracts and Unexpired Leases prior to the Effective Date will be cured pursuant to section 8.4 of the Plan and the terms of the applicable contract and/or non-bankruptcy law, whichever is applicable. Accordingly, I believe the Plan complies with Bankruptcy Code section 1123(d).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: October 13, 2020                                          /s/ Pankaj Parekh
                                                                 Pankaj Parekh, CEO